IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF RAYNYA V. & JAYCEON W.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF RAYNYA V. AND JAYCEON W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

IRIS J., APPELLANT.


Filed August 29, 2023.    No. A-23-055.


Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Angela H. Heimes, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellant.

Regina T. Makaitis, guardian ad litem.

Christine P. Costantakos, guardian ad litem.


BISHOP, MOORE, and ARTERBURN, Judges.

BISHOP, Judge.

### INTRODUCTION

Iris J. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her two children, Raynya V. and Jayceon W. We affirm.

### BACKGROUND

#### PROCEDURAL BACKGROUND

Iris is the mother of Raynya, born in 2011, and Jayceon, born in 2012. Rayvell V. is Raynya's father. Vincent W. is Jayceon's father. The children's guardian ad litem (GAL) sought

- 1 -

to terminate Rayvell's and Vincent's parental rights during these same juvenile proceedings below, but the current status of their parental rights is not apparent from the record before us in this appeal. Because neither Rayvell nor Vincent are part of this appeal, they will not be discussed any further.

In April 2013, the children were removed from Iris' home due to concerns that they had been exposed to drugs while in her home.

On April 10, 2013, the State filed a petition alleging that Raynya and Jayceon were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) because they lacked proper parental care by reason of the faults or habits of Iris in that:

> A. On or about April 2, 2013, Iris . . . signed a voluntary agreement placing said children in the temporary care and custody of Nebraska Department of Health and Human Services.
>
> B. On or about April 2, 2013, said children tested positive for Amphetamine, Cocaine and Cannabinoids.
>
> C. Iris . . . has failed to work with Nebraska Department of Health and Human Services on a voluntary basis.
>
> D. Iris . . . has failed to provide said children with safe, stable and/or appropriate housing.
>
> E. Iris . . . has left said children with inappropriate caregivers.
>
> F. Iris . . . has failed to provide proper parental care, support and/or supervision for said children.
>
> G. Due to the above allegations, said children are at risk for harm.

Additionally, the State filed a motion for the immediate temporary custody of Raynya and Jayceon, asking that they be placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS) for placement in foster care or other appropriate placement, to exclude the home of Iris. The juvenile court entered the custody order that same day and Raynya and Jayceon have remained in foster care ever since, except for a few months in 2016 when they lived with Iris.

In August 2013, Raynya and Jayceon were adjudicated to be within the meaning of § 43-247(3)(a) based on Iris' admission to the allegations in parts B, C, and G of the petition; parts A, D, E, and F were dismissed pursuant to a plea agreement. The matter proceeded to disposition and the juvenile court ordered Iris to: obtain and maintain safe, stable, and adequate housing and provide proof to the case manager; obtain and maintain a legal, stable source of income and provide proof to the case manager; "participate with a family support worker to assist with stabilizing housing and income, apply for food stamp benefits, arranging medical and dental checkups, and assist with clothing voucher (by August 16, 2013)"; submit to random drug testing; complete chemical dependency and psychological evaluations by September 14, 2013; work with DHHS to identify a natural support system within her family and/or community; have reasonable rights of supervised visitation; timely notify the court of any services she deems necessary to assist with the return of the children to the parental home; and follow the rehabilitation plan of the court and also make reasonable efforts on her own to bring about rehabilitation. Following a continued disposition hearing in October, Iris was also ordered to participate in individual therapy, participate

in a psychiatric assessment to determine any medication needs, complete a domestic violence program, and submit to random urinalysis testing within 4 hours of a request by the case manager.

Numerous review and permanency hearings were held in this case, and Iris' court-ordered requirements remained substantially the same. However, we note that in May 2014, Iris was additionally ordered to take her medications as set forth in a specified exhibit received at that hearing. In October 2015, the juvenile court sustained a motion filed on Iris' behalf for semi-supervised visits and overnight visits. But in December 2015, the court ordered that Iris' visits be supervised, and she was additionally ordered to successfully complete treatment as set forth in specified exhibits received at that hearing. On March 30, 2016, the court adopted the GAL's transition plan to return the children to Iris' home. The GAL's recommendation was that visits would transition to unsupervised and placement in Iris' home would occur in stages, beginning with one overnight and then adding an additional overnight each week until after a 7-week transition, if there were no safety concerns, the children would remain in Iris' home. However, on August 2, 2016, the children were once again removed from Iris' home by court order, and they have remained in foster care ever since. In February 2017, the court ordered that visits "shall remain supervised."

Three different times in 2016 and 2017, motions were filed to terminate Iris' parental rights to Raynya and Jayceon pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), alleging that such termination was in the children's best interests. Each time, however, the State or the children's GAL subsequently moved to dismiss or withdraw its motion to terminate parental rights and the motions were sustained.

In a review and permanency planning order entered on August 3, 2017, the juvenile court found, "That with respect to [Iris], no further reasonable efforts shall be required, but self-help obligations continue." Subsequently, in May 2020, the court found, "That with respect to [Iris], reasonable efforts shall be restored." The court also ordered that Iris have "reasonable rights of monitored visits which may include overnight once social distancing restrictions due to the pandemic are lifted." However, on July 27, the court, in response to a motion filed by the children's GAL, found that "it is a matter of immediate and urgent necessity that monitored visitation between [Iris] and the minor children cease at once," and it ordered that Iris' visits with the children be fully supervised by an agency. In a review and permanency planning order entered on August 20, 2021, the court ordered that Iris have reasonable rights of semi-supervised visits, but not overnights.

On October 22, 2021, the children's GAL filed a motion to terminate Iris' parental rights to Raynya and Jayceon pursuant to § 43-292(2) and (7). The GAL alleged that Iris had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection, Raynya and Jayceon had been in an out-of-home placement for 15 or more months of the most recent 22 months, and termination of Iris' parental rights was in the children's best interests.

TERMINATION HEARING

The parental rights termination hearing was held on December 5 and 6, 2022. The GAL called several witnesses to testify, and numerous exhibits were received into evidence. Iris did not testify, and she did not call any witnesses to testify on her behalf.

Gay Malone was the children and family services specialist assigned to this family from August 2019 through August 2020. When Malone took over the case, she had a transfer meeting with her supervisor and the previous caseworker and supervisor. She also reviewed the records in the case file. Malone testified that when she took over the case, Iris was court-ordered to make self-help efforts on her own, because reasonable efforts were no longer required at that point; Iris was employed, participating in drug testing, and having weekly supervised visits with the children.

To Malone's recollection, there was no court order for drug testing for Iris from November 2019 until the time Malone retired on August 14, 2020. Prior to November 2019, Iris had been regularly submitting to urinalysis drug testing, and the results provided to Malone were all negative.

During her time on the case, Malone met with Iris a minimum of once per month. Malone said that Iris talked about what happened in 2016 after the children were returned to her and what led to the children being removed from her again; Iris told her that she had no money to take care of the children, so she left them and was then arrested for prostitution. Malone arranged family support for Iris and arranged for Iris to complete a court-ordered bonding assessment with Dr. Glenda Cottam.

Dr. Cottam, a clinical psychologist, testified that she completed a bonding assessment of Iris, Raynya, and Jayceon in January 2020; her written report was received into evidence. Dr. Cottam interviewed each of them, administered certain tests and questionnaires for each, and watched Iris and the children interact together. She also briefly interviewed the children's foster mother and had her fill out demographic questionnaires "[b]ecause the foster parent is the individual who is the current primary care provider" and knows the "latest information" about the children, e.g., how they are doing in school and their physical health.

When Dr. Cottam interviewed Iris, Iris indicated that her children were removed from her care in 2013 because they were being watched by a relative for 2 days, and while in the relative's care, the children were exposed to drugs which were detected on a hair follicle test. Iris told Dr. Cottam that the children were returned to her care for a few months in 2016 but were removed again after Iris got into legal trouble because of her involvement with a prostitution ring. As to why the children were not with Iris at the time of the bonding assessment, Dr. Cottam said that Iris "had some difficulty with some of the previous individuals involved" and "seemed to indicate that she was being treated unfairly and that the children should be back with her."

Dr. Cottam stated that during the bonding assessment both children referred to their mother as "Iris." They were excited to see Iris, and the interaction Dr. Cottam observed "overall . . . went well." Dr. Cottam "thought the children were very bonded with each other" and "seemed to be bonded and comfortable with [Iris]." Dr. Cottam thought it was best for the children and Iris that visits continue to be supervised because "in the short time that I observed them, there was some testing behavior going on," "but if it was longer and there was more testing behavior . . . . Just want to make sure things run okay." At the time of her assessment, Dr. Cottam believed that family therapy could be beneficial because the primary goal for the family was reunification. Dr. Cottam also believed it would be helpful for Iris to get an updated psychological assessment because it appeared that her previous assessment was "some years ago." In the conclusion of her report, Dr. Cottam wrote,

As with all Juvenile Court cases: Children need permanency – a secure and stable base that will allow them to help meet their potential: If parents cannot continue to demonstrate progress and compliance with the Court's recommendations and Orders, guardianship and/or adoption must be strongly considered as in the best interests of the children.

Dr. Cottam testified, "I add[] that to many of the reports that I perform or that I conduct because I believe that children cannot just hang out indefinitely not knowing what their future is going to be," "[t]hey need some kind of basic confirmation of security, a secure base to help them go forward in life." When asked if the length of time that Raynya and Jayceon had been in care concerned her, Dr. Cottam replied, "Yes."

Caseworker Malone testified that in April 2020, she recommended that Iris' visits be moved to monitored (also called semi-supervised) visits, to include overnight visits, because Iris had shown stability in employment and housing for several months, and she was working with family support. Malone also considered the generally positive visitation reports, and Dr. Cottam's findings that the interactions between Iris and the children were positive and she demonstrated the ability to redirect the children. The juvenile court approved Malone's recommendation following the May court hearing. However, the monitored visits could not begin right away because of the COVID-19 pandemic; Malone could not remember when monitored visits began.

Malone testified that following the court hearing in May 2020, Iris told her that she was going under house arrest on May 20 for her sentence stemming from a June 2019 DUI. After Memorial Day 2020, Malone recommended that Iris participate in an updated substance abuse evaluation. Iris subsequently completed the updated substance abuse evaluation with Maggie Borgmann.

Borgmann, a licensed independent mental health practitioner at Jenda Family Services Outpatient Clinic, conducted a co-occurring evaluation of Iris on July 8, 2020; her written report was received into evidence. In her testimony, Borgmann noted that Iris had received a DUI charge in early 2019. Borgmann had also been informed via the caseworker that Iris was serving a 2-week house arrest in May 2020, which ended after a police officer stated he observed Iris intoxicated with the ankle monitor on. (Included in our record is a May 29 journal entry and order from Iris' criminal case for the DUI. It states: "[Iris] has violated her terms of house arrest. She is taken into custody to serve full sentence of 14 days.") In her report, Borgmann stated, "When inquired of the May 2020 report of intoxication while being on house arrest, [Iris] denied this and stated it was a lie."

Borgmann diagnosed Iris with "Alcohol use disorder, moderate." This was "[b]ased off of the criteria that she had continued to use alcohol despite DHHS involvement." Borgmann stated that Iris wanted to be sober, but "despite DHHS involvement, she had continued to use, indicating difficulty ceasing use and using over a longer period of time [than intended]." Borgmann testified that based on one of the screening tests, Iris was in the "contemplative stage of change." However, "[Iris] denied a need for treatment, which indicates this vacillation between precontemplative and contemplative stage of change." Borgmann did not agree with Iris' statement that she did not need treatment. In her report, Borgmann recommended that Iris participate in twice weekly outpatient therapy with a duly licensed therapist "to address her substance use and thinking patterns that have

led to DHHS and legal involvement"; "Iris would also benefit from participating in a prosocial activity such as NA/AA or Smart Recovery to reinforce sobriety and increase positive supports." On cross-examination, Borgmann was asked if either the Substance Abuse Subtle Screening Inventory or the Self-Administered Alcoholic Screening Test she did with Iris raised any concerns; she replied, "No."

Borgmann testified that during the evaluation, Iris denied that her alcohol use impacted her daily functioning and her ability to have her children. However, after the evaluation, but before Borgmann completed her report, Borgmann was informed by caseworker Malone that Iris had been under the influence at a visit on July 24, 2020, and that visit was canceled. With that additional information, Borgmann was concerned about how Iris' alcohol use was impacting her parenting. Borgmann did not have any contact with Iris after receiving the information from Malone.

Caseworker Malone testified that following Iris' evaluation with Borgmann, Iris had a relapse in July 2020. On July 27, Malone met with Iris to discuss concerns that Malone had about an overnight visit that was scheduled for July 24. Iris told Malone that she could not remember what happened that night and that she only remembered waking up at the hospital the next morning. After Malone read her an email that she had received from the visitation worker, Iris told Malone that right before that overnight visit was to start, she had been drinking and taking shots with a friend, and that was all that she remembered except for being in the hospital the next morning. Iris thought the person she had been drinking with had put something in her drink, but when Malone asked to see Iris' discharge papers from the hospital (to see if there was a drug panel screening), Iris said she had thrown the papers away. Malone testified that Iris admitted that she had relapsed. From what Malone remembered, "[Iris] told me that her auntie and an uncle had died and that she was depressed." On July 27, the juvenile court ordered Iris' visits go back to being fully supervised.

At the conclusion of Malone's time on the case in August 2020, she opined that terminating Iris' parental rights was in the children's best interests because they had been out-of-home for 85 months. She said Iris only had the children back in her care for "three months" in 2016, later got back to the point of moving towards overnights, "then the incident occurred at the visit that required the visit to be stopped."

Lisa Pollard is a child and family services specialist. She was assigned to this family's case in July 2021 and was their ongoing case manager at the time of the termination hearing. Pollard testified that when she took over the case, she had a transfer meeting with her supervisor, and the outgoing caseworker (Danielle Jones) and supervisor. Pollard also reviewed the case file, including assessments and evaluations, service provider reports, court reports, and court orders. When Pollard received the case, Iris was receiving only general case management and supervised visitation. Pollard stated that it was her understanding that Iris had been successfully discharged from outpatient services with "Jenda" with the recommendation for her to do individual therapy if she believed she needed additional support. It had also been conveyed to Pollard at the case transfer that Iris was making good progress with her children and with the court's orders. After a court hearing in August, Iris' visits were changed to semi-supervised. Additionally, the juvenile court ordered Iris to participate in random urinalysis testing, which Pollard arranged. In September, Pollard contacted Iris about a positive drug test, and Iris admitted using THC/marijuana because

the children did not want to increase their visits with her. There were subsequent occasions when Iris missed drug tests. Otherwise, Iris regularly participated in the 12 tests each month.

Amanda Mason, a licensed independent mental health practitioner and licensed alcohol and drug counselor at Jenda Family Services, testified that she provided a co-occurring evaluation for Iris in November of 2021; her written report was received into evidence. According to Mason, the referral from DHHS stated that Iris had been clean for quite a while, but then she tested positive for marijuana, and then missed a couple of tests after that. Mason said Iris told her that prior to her positive drug test in September 2021, she had not used marijuana in a while. As for her positive test, Iris told Mason that she had accidentally used THC by taking a hit off of a friend's vape pen. However, that contradicted collateral information Mason received from caseworker Pollard--that Iris told Pollard that she used marijuana or THC after her daughter said she did not want increased visits. Mason said Iris also indicated that she had stopped drinking alcohol for a long period of time, but that she had too much to drink after her aunt passed away in June 2020; she reported that was the last time she drank alcohol.

Mason testified that based on one of the screening tests, Iris was in the "contemplative stage of change" (according to Mason's report, Iris was in the "pre-contemplation stage"), meaning that she was "aware of the problem but not quite ready to make changes yet." In her report, Mason diagnosed Iris with "Other Specified Trauma-and Stressor-Related Disorder" and "Cannabis Use Disorder, Mild." Mason recommended that Iris "continue to drug test for accountability" and that she "[a]ttend a weekly prosocial activity to help build her sober support network," e.g., "AA, NA, WRAP . . . group, or SMART recovery." During her testimony, Mason opined that Iris would be compliant with the recommendations she made. Mason did not recommend any treatment because "[u]sually when we have someone who has a period of sobriety and they just have one positive drug test, that's not usually something that we jump right to a specific treatment." When asked how long of a period of sobriety she would look at to determine that, Mason said she would usually look at the past year. According to Mason, "[I]ris stated she's gone to AA before 'to look good for court.'" On cross-examination, when asked if it really mattered why Iris started AA as long as she participated and benefited from it, Mason replied, "Theoretically, no."

When contacted to testify in this case, Dr. Cottam requested that collateral information be provided to her because "it had been some time since [she] had seen [Iris]." Dr. Cottam said she subsequently reviewed a March or May 2021 court order that gave the status of the case at that time, and two co-occurring evaluations for Iris. Based on the totality of the information she obtained during the bonding assessment, as well as the more recent collateral information provided to her, Dr. Cottam opined that it was not in the children's best interests to reunite with Iris at this time because "[i]n reading the reports, the two adult co-occurring evaluations, there was indication of ongoing problems."

Katherine Lantis supervised Iris' visits with Raynya and Jayceon from November 2021 through November 2022. Lantis testified that the referral for Iris specifically stated no unauthorized persons were to be present, no substance use, and Iris was to care for the children's emotional and physical needs. Iris had visits on Mondays and Tuesdays for 2 hours each day, Fridays for 3½ to 4 hours, and Sundays for 4¾ hours. The visits were monitored/semi-supervised, and mostly occurred in Iris' apartment.

Lantis originally transported the children for visits, but in March 2022, Iris was approved to start driving the children and took over transportation. In May, Lantis had been asked by the children's placement to meet at the daycare. When Lantis got to the daycare, "Jayceon grabbed his things and got in [Lantis'] car while Raynya went with Iris." Lantis said this happened on three occasions.

Lantis observed Iris using inappropriate language towards the children on "a few occasions." Lantis also observed "Iris become agitated when the children were also agitated," "[t]hey would argue back and forth with each other." In December 2021, Lantis was monitoring a visit and Iris found an order form for Jayceon's school pictures, and it had some sample pictures on it. Iris said she was going to cut one out and keep it because she had not had the chance to order her own pictures. Lantis said that Jayceon "was very unhappy about that and did not want [Iris] to have a picture," and he and Iris "argued back and forth" for quite some time and "[t]here was some cussing involved on [Iris'] part." In March 2022, "Iris became very upset [that Raynya lost a necklace Iris had gifted to her,] and [Iris] asked if she knew how much that necklace cost and said that she should have just f[******] kept it herself"; Raynya "was very quiet and looked at the floor and didn't respond." When Lantis arrived for a check-in on May 22, Jayceon was holding a cold drink on his forehead and appeared upset. Lantis said that when she asked Iris what happened, "[Iris] told me that she had been frustrated that the remote control in the room wasn't working," "and she threw the remote, and it hit Jayceon in the head." Lantis said that Iris "consistently told [Jayceon] that it wasn't intentional and asked him to get over it." Additionally, Iris "was very concerned about [Lantis'] notes for that day, saying that it was going to make her look like a terrible mother." When asked if Iris tried to comfort Jayceon in any way, Lantis replied, "There was one moment where she attempted to calm him down, but it didn't work[,] [a]nd then she continued to say that she was worried about looking like a bad parent." Another issue that caused Lantis some concern was that Raynya's father could call as long as Lantis was present, but Iris felt that rule "was stupid" and did not comply with limiting his calls.

Lantis testified that other than the incidents described above, Iris' visits went well. Iris cooked dinner for the children most of the time, cared for their physical needs, and fixed their hair on a number of occasions. Lantis said that the children did have a lot of screen time, but Iris tried to take them out into the community and do activities at least once a week. Lantis confirmed that most of the time the children looked happy to see Iris and Iris looked happy to see them. Iris hugged the children when they left, and the children also initiated hugs.

Caseworker Pollard testified that in the spring or summer of 2022 she randomly encountered Iris at the prison in Tecumseh, Nebraska. Iris was visiting an inmate there and according to Pollard, it looked like Iris and the inmate were in a romantic relationship. When Pollard asked Iris who she was visiting, she gave Pollard the inmate's first name. When Pollard spoke to Iris again later, Iris gave Pollard the inmate's full name, said he was a childhood friend, and that the relationship was none of Pollard's business because it was not relevant to the case. Pollard said she asked Iris to agree to not have the inmate present via phone on her monitored/semi-supervised visits with the children. Pollard testified that "it goes to the heart of the adjudicated issues in this case, . . . leaving the kids with inappropriate people" and "[s]o the concern would have been exposing the kids to an incarcerated felon." A month after initially seeing Iris at the prison, Pollard observed Iris at the prison for a second time, and again emphasized to

her that the inmate should not be present on her monitored visits with the children. On cross-examination, Pollard recalled Iris saying that she would agree to not have contact "with him and the kids." Pollard stated there is no safety concern if the children do not have contact with him.

During Pollard's time on the case, Iris maintained housing, and she had been employed since January 2022. According to Pollard, at the time of the termination hearing, Raynya was 11 years old, and Jayceon was 9 years old. Pollard stated that the children had been in foster care since 2013, other than for the brief period of time when they were returned to Iris in 2016. The children were currently having semi-supervised visits with Iris four times each week. Pollard stated that in order to return the children to Iris, "we would need to observe her during a period of transition from semi-supervised visits to monitored overnight visits and ensure that she can sustain under those circumstances." She continued, "Any setback could throw the permanency timeline further back[,] [a]nd what the history of this case demonstrates is that when [Iris] is under stress, she sometimes relapses." Pollard said, "in looking at the history of this case, that seems to happen. I mean, we make progress, and then there's a setback like in 2016. We're in 2019 where we go back to square one"; "the kids have a right to permanency" and "they can't linger forever in care while the parents figure it out," that is not in their best interests. And in Pollard's opinion, "we're looking at . . . continuing in this case for a much longer time than . . . the kids should be in care." Pollard opined that it was in the children's best interest to terminate Iris' parental rights

> [b]ecause the kids deserve permanency after nine years. . . . They've grown up in foster care. [Jayceon] is almost ready to graduate from elementary school. [Raynya] started middle school, and they deserve to know where their forever place is going to be and where and who their forever people are going to be. We need to find that for the kids.

On cross-examination, Pollard testified that she had observed a bond between Iris and her children.

### JUVENILE COURT'S DECISION

In an order filed on January 3, 2023, the juvenile court terminated Iris' parental rights to Raynya and Jayceon after finding that statutory grounds for termination existed pursuant to § 43-292(2) and (7), and that termination of parental rights was in the children's best interests. The court also found that it was in the best interests, safety, and welfare of the children to remain in the custody of DHHS for adoptive planning and placement, and the court ordered that DHHS was authorized to consent to the legal adoption of the children.

Iris appeals.

### ASSIGNMENTS OF ERROR

Iris assigns, restated, that the juvenile court erred in finding (1) statutory grounds exist to terminate her parental rights under § 43-292, (2) termination of her parental rights was in the children's best interests, and (3) it was in the children's best interests to remain in the custody of DHHS for adoptive planning and placement.

### STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*,

309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The children's GAL sought to terminate Iris' parental rights to Raynya and Jayceon under § 43-292(2) and (7). The juvenile court found that both of those grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra.* Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra.* In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra.*

Raynya and Jayceon were removed from Iris' care in April 2013 and remained in foster care thereafter, except for a few months in 2016 when the children lived with Iris. By the time the motion to terminate parental rights was filed on October 22, 2021, Raynya and Jayceon had been in an out-of-home placement for all but a few months of the previous 8½ years. The 15-out-of-22 months' period was clearly satisfied.

The GAL has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Iris' parental rights to Raynya and Jayceon. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra.* We next consider whether termination is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each

examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Iris' progress in this case has been back-and-forth. Raynya and Jayceon were removed from Iris' care in 2013 after their hair follicles tested positive for amphetamine, cocaine, and cannabinoids, and Iris failed to work with DHHS on a voluntary basis. After the children's removal, Iris had supervised visits with them. By October 2015, Iris had progressed to semi-supervised visits, including overnights, but by December of that year, she was back to fully supervised visits. By March 30, 2016, Iris had apparently made sufficient progress to the point that the juvenile court adopted a transition plan to return the children to her home. However, by August 2, the children were again removed from Iris. From August 2017 to May 2020, the court ordered that no reasonable efforts were required to be made for Iris, but that she still had self-help obligations. She apparently did well, because in May 2020 the court ordered that reasonable efforts were restored, and Iris was granted semi-supervised visits, including overnights. However, Iris was drinking and taking shots before a July visit, and only remembered waking up in the hospital the next morning, and the court subsequently ordered her visits to immediately return to being fully supervised. In September Iris tested positive for marijuana and later gave Pollard and Mason contradicting accounts as to why or how that had happened. It was not until August 2021 that Iris was once again granted semi-supervised visits (no overnights), and she remained at semi-supervised visits at the time of the termination hearing.

Although Iris had provided for the children's basic needs whenever they had visits with her, she was still only having semi-supervised visits at the time of the termination hearing. Iris points to the "undeniable" bond she has with her children. Brief for appellant at 17. But having a bond with a child does not make a parent a fit person to provide parental care for him or her. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). And caseworkers Malone and Pollard and Dr. Cottam all opined that it was in the children's best interests to terminate Iris' parental rights. We agree.

At the time the termination hearing concluded, Raynya and Jayceon had been in an out-of-home placement for all but a few months of the previous 9½ years. Although Iris made progress several times throughout this case, that progress was not sustained. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Raynya and Jayceon deserve permanency. And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The GAL proved that Iris was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Raynya's and Jayceon's best interests to terminate Iris' parental rights.

### DHHS Custody for Adoptive Planning and Placement

Because we have already found that statutory grounds existed to terminate Iris' parental rights, and that terminating Iris' parental rights was in the children's best interest, we also find that

it was in the children's best interests to remain in the custody of DHHS for adoptive planning and placement.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Iris' parental rights to Raynya and Jayceon.

AFFIRMED.